Edward J. **ALEX** t/a E. J. Alex
Construction Company
v.
**HENRY S. CONREY, INC.**
Civ. A. No. 70–2847.

United States District Court,
E. D. Pennsylvania.
July 30, 1974.

**1148**

Thomas B. Rutter, Philadelphia, Pa., for plaintiff.

William L. McLaughlin, Paoli, Pa., for defendant.

## FINDINGS OF FACT

NEWCOMER, District Judge.

This case involves an oral contract between plaintiff and defendant which contract required defendant to perform a survey for plaintiff in order that plaintiff could lay a foundation for the erection of a certain parabolic antenna for use by the University of Pennsylvania. An error in the survey caused the direction of the antenna to be off by six (6) degrees requiring plaintiff to expend an additional sum of money to correct the problem. The question as to the amount of said additional expenditure provides us with the subject of this law suit. Accordingly, we make the following findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a):

1. Plaintiff, Edward J. Alex, is an individual citizen of the Commonwealth of Massachusetts trading under the name of E. J. Alex Construction Co.

2. Defendant Henry S. Conrey, Inc., is a Pennsylvania corporation having its principal place of business at 159 Lancaster Avenue, Paoli, Pennsylvania.

3. The amount in controversy exceeds the sum of $10,000. Dollars, exclusive of costs.

4. At all times pertinent to this action, plaintiff, Edward J. Alex, t/a E. J. Alex Construction Co., has been engaged in the general contracting business, specializing in steel and concrete work including antennae and antenna foundations.

5. At all times pertinent to this action, defendant Henry S. Conrey, Inc., has been a registered land surveying firm with Henry S. Conrey being the licensed professional engineer for the firm, and with the firm being engaged in the business of performing land surveys.

6. On or about April 30, 1968, plaintiff entered into an oral contract with defendant whereby defendant was to perform a land survey at a site in Valley Forge, Pennsylvania to provide the azimuth direction of a radio tower to be erected at the site by plaintiff pursuant to plaintiff's contract with the University of Pennsylvania.

7. The purpose of the survey to be performed by defendant pursuant to the oral contract referred to in the preceding finding of fact was to provide precise orientation (azimuth) in a true north-south direction for the parabolic transmitting antenna to be erected by plaintiff so that transmissions from the antenna in Valley Forge would hit a receiving antenna located on Wallups Island, Virginia.

8. Plaintiff has performed all conditions required of him necessary to permit defendant to perform its obligations under the oral contract previously referred to.

9. The radio antenna to be erected by plaintiff consisted, essentially, of three parts: a concrete foundation pedestal on which it was anchored; the steel tower itself which rose approximately 30 feet in the air; and a parabolic aluminum dish on top of the tower, which dish was approximately 50 feet in diameter.

10. Under its contract with the University of Pennsylvania, plaintiff was obliged to supply an antenna which would transmit on a direct line from Valley Forge to Wallups Island.

11. Defendant was informed, prior to entering into the contract with plaintiff referred to above, that plaintiff was erecting an antenna that had to be faced toward Wallups Island, Va. and that defendant's survey was required in order that the foundation for the antenna would be precisely oriented in the proper direction.

12. The parabolic antenna dish on top of the tower could not be rotated or moved from side to side; hence, an error in the orientation/azimuth of the tower meant that transmissions from the antenna in Valley Forge would not hit the receiving antenna on Wallups Island.

13. On or about May 23, 1968, defendant informed plaintiff that defendant had completed the land survey and advised plaintiff that plaintiff could rely on the accuracy of defendant's survey.

14. Specifically, defendant had performed its survey by observation of the star Polaris and had performed mathematical calculations and drawn survey lines, and had placed stakes in the ground where the front two piers of the antenna foundation were to be placed by plaintiff.

15. In reliance upon defendant's placement of the stakes in the ground—called a base line—plaintiff dug the holes and made necessary preparations for placement of the concrete foundation pedestal.

16. Thereafter, plaintiff further inquired of defendant as to the accuracy of defendant's survey and, acting in reliance upon defendant's renewed assurances that the survey was accurate in all respects, plaintiff poured the concrete footings, installed the foundation steel, completed the foundation and erected the steel radio tower itself.

17. Thereafter, following a third inquiry of defendant by plaintiff as to the accuracy of defendant's survey—at a time when the sole remaining construction activity with respect to the tower was placement of the parabolic dish on top of the tower—defendant resurveyed the orientation of the tower and informed plaintiff that defendant had made a six (6) degree error in its calculation of the orientation azimuth.

18. Defendant has admitted, both in pre-trial discovery, and at trial, its mistake in the survey and the effect of that survey on the orientation of the tower saying for example:

". . . Mr. Conrey will state for the record that Mr. Conrey's engineering firm made an error in locating the base of the tower. There was a 6-degree error in azimuth, so that the tower was not pointed to Wallups Island as it should have been. . . ." (N.T. 8)

19. As a result of defendant's error in its survey, and the resulting misdirection of the tower, transmissions from the Valley Forge site would not be received by the Wallups Island tower.

20. A failure in transmission as described in the foregoing finding of fact constituted a breach by plaintiff of its contract with the University of Pennsylvania which, if uncorrected, would cause plaintiff to forfeit its right to payment under that contract and expose plaintiff to the other legal consequences of a breach of contract.

21. Because of the error, the plaintiff employed Dr. Sidney Shore, a professor at the University of Pennsylvania, for the purpose of determining how the error should be corrected.

22. The defendant employed a mechanical engineer, Mr. Raymond LeBer,

an assistant professor of Villanova University, for the purpose of studying the problem and to confer with Dr. Shore as to what steps could and should be taken to correct the problem.

23. Pursuant to his employment Mr. LeBer went to the site and examined the tower erected as well as the antenna dish which was to be placed thereon.

24. Mr. LeBer calculated that the tower would not support the antenna dish.

25. At a meeting by and between Mr. LeBer and Dr. Shore on or about August 7, 1968, Mr. LeBer advised Dr. Shore as to the inadequacy of the tower.

26. Dr. Shore never communicated to Mr. Alex the information received from Mr. LeBer regarding the inadequacy of the tower.

27. Defendant made no suggestion to plaintiff as to any method whereby the misdirection of the radio antenna due to defendant's surveying error could be corrected.[1]

28. Dr. Shore recommended, essentially, three possible methods to correct the misdirection of the antenna resulting from defendant's surveying error: (a) modification of the already erected tower by twisting it to correct the direction in which it faced; (b) erection of a new tower with the twist built into it so as to give the proper direction; or (c) correction of the concrete foundation pedestal either by modifying the already built pedestal or by installation of a new pedestal at a new location.

29. Plaintiff, in consultation with representatives of the University of Pennsylvania for whom he was building the tower, made the choice as to which of the alternative methods suggested by Dr. Shore to correct the misdirection would be employed.

30. Although plaintiff was willing to modify the already erected tower, the representatives of the University of Pennsylvania for whom plaintiff was erecting the tower refused to accede to a correction of the misdirection by modification of the already erected tower for the reasons that: (a) the tower was not owned by the University but was, rather, merely borrowed from the Radio Corporation of America and (b) building a twist into the already erected tower would create an unsightly "Rube Goldberg" appearance which the University considered to be unacceptable in the scientific community and in connection with the federal National Science Foundation grant under which the University was to use the tower upon completion of the erection.[2]

31. In connection with erection of a new tower with a correctional six (6) degree twist in it, plaintiff was required to obtain a new land survey which was done by Yerkes Engineering at a cost of $200.00.

32. In connection with erection of a new tower with a correctional six (6) degree twist in it, plaintiff was required to obtain the expert services of Dr. Shore both for consultation and for preparation of the design of the new tower at a cost of $2750.00 Dollars.

33. In connection with erection of a new tower with a correctional six (6) degree twist in it, plaintiff was required to contract for the fabrication of the steel tower with Belmont Iron Works at a cost of $7498.00 Dollars.

34. In connection with erection of a new tower with a correctional six (6) degree twist in it, plaintiff was required

---

1. Even defendant's designated expert, Mr. LeBer, made no suggestion to plaintiff or plaintiff's expert, Dr. Shore, as to any method whereby the misdirection could be corrected. In fact, even at trial, defendant made no suggestion as to a method of correction which would be feasible both technically and economically.

2. Although defendant has suggested during trial that modification of the already erected tower was a possible mode of correcting the misdirection of the tower, defendant presented no evidence as to the comparable costs of using this method, that it was preferable over the method actually chosen, or that the University's refusal to permit this method to be employed was unreasonable.

to rent a crane to dismantle the existing tower and to erect the new tower, such crane being rented from Falls Equipment Co. and Chester County Crane Service at the following costs to plaintiff:

| | |
|---|---|
| Chester County Crane | $ 514.64 |
| Falls Equipment | $1,077.28 |
| Falls Equipment | $1,150.64 |

35. In connection with erection of a new tower with a correctional (6) degree twist in it, plaintiff was required to purchase miscellaneous supplies (e. g., bolts, etc.) at a cost of $261.44.

36. Mr. Alex himself was required to make three separate trips to Philadelphia at a cost to plaintiff of $1,125.30 Dollars.

37. In connection with erection of a new tower with a correctional six (6) degree twist in it, plaintiff incurred additional overhead expenses calculated, as is customary in the construction business, on the basis of 20 per cent of the costs, not including labor, so that plaintiff here incurred additional overhead expenses in the amount of $2,915.46.

38. In connection with erection of a new tower with a correctional six (6) degree twist in it, plaintiff incurred additional labor costs totalling $6,144.00.

39. All of the foregoing expenses were incurred by plaintiff by the summer of 1969.

40. The value of the original contract between the University of Pennsylvania and E. J. Alex Construction Company was Twenty Six Thousand Nine Hundred and Forty-seven Dollars ($26,947).

41. Mr. Alex testified that to move the old tower to new footings at a new location would cost about Sixteen Thousand Dollars ($16,000).

42. It took 160 hours to take down the old tower and 480 hours to put up the new tower.

43. Mr. Alex testified that he encountered unexpected costs in erecting the new tower on the original pedestals.

44. The six (6) degree error constituted a breach of defendant's oral contract with plaintiff and defendant is therefore liable for any reasonably foreseeable damage which were a proximate and natural result of the breach.

## DISCUSSION

This is a diversity case, and therefore we will apply the substantive law of Pennsylvania.

Defendant admits that it made an error in the survey at the site of the tower involved herein which resulted in a six (6) degree error in azimuth. This error had to be corrected and defendant admits that it is liable to plaintiff for any damages proximately caused by the error which could have reasonably been foreseen by defendant at the time the oral contract came into existence.

Plaintiff is claiming all those damages caused by the error which resulted in the building of a new tower which tower was considerably stronger and heavier than the original tower. Defendant claims that the University of Pennsylvania through Dr. Shore, is attempting to use the fact of defendant's error to pay for a new tower which is substantially different than the original tower.

Plaintiff is correct that he may recover remedial damages in this situation. See Lobozzo v. Adam Eidemiller, Inc., 437 Pa. 360, 263 A.2d 432 (1970). However, remedial damages are consequential in nature and before such damages can be awarded we must find that at the time the contract was entered into, it was reasonably foreseeable that those damages would result as a consequence of a breach of that contract. We must, therefore, decide whether or not all of the expenses incurred by the plaintiff in erecting a new tower at the site of the old one could have been reasonably foreseen to have resulted from a six (6) degree surveyor's error in azimuth or whether or not some other measure of damage would be more appropriate under the law of Pennsylvania. See Raby,

Inc. v. Ward-Meehan Co., 261 Pa. 468, 104 A. 750 (1918).

Several problems arise which must be commented upon. The original tower was owned by the RCA Corp. which is not a party to this action and was apparently on loan from RCA to the University of Pennsylvania in connection with the University's scientific study involving clear air turbulence. There is evidence in the record which establishes that an alternative method of solving the six (6) degree error by correcting the top of the original tower to which the dish would have been attached was not considered to be an available alternative because the University did not own the tower and felt that the substantial modification required in order to correct the error was not permitted by its agreement with the University of Pennsylvania.

■ Also, there is evidence that the antenna dish had been modified by the addition of some 14,000 lbs. in counterweights, but it is not absolutely clear from the record when this extra weight was added. Defendant's expert Mr. LeBer made a statement that the weight had been added before the dish had been removed while in use at Moorestown, New Jersey. This is important because the same tower which was used to support the dish in Moorestown was to be used at the Valley Forge site and is the "old" tower involved in this suit. However, we do not believe that defendant's theory that plaintiff occasioned no damage as a result of the breach because the old tower was not of sufficient strength to support the antenna dish is valid. We believe that the antenna was used with this old tower for approximately 20 years in Moorestown and during part of that time it was used with the additional weight. Also, plaintiff was not concerned with the strength of the old tower because the contract between plaintiff and defendant did not relate to the use of any particular tower but merely related to the accuracy of the survey in question. Therefore, we do not believe that defendant by its six (6) degree error merely afforded plaintiff the opportunity to correct a situation not caused by defendant. Defendant created the need to correct the error by its own mistake, and it is liable for the consequential damages flowing therefrom.

■■ We believe that the defendant should be required to compensate plaintiff for those expenses related to the movement of the old tower to a new site had that alternative for solving the problem been chosen by plaintiff. We do not feel that defendant should be required to reimburse plaintiff for the expenses incurred by the erection of a new tower because incurrence of those expenses we feel were not reasonably foreseeable at the time the contract was entered into.

Ideally, we would have considered evidence regarding the correction of the top of the old tower to be the best alternative. However, the plaintiff was not able to consider this alternative because the University of Pennsylvania would not accept it. Plaintiff chose a reasonable alternative in light of the situation as it developed after the breach, but one which was not foreseeable at the time the contract was entered into.

■ Mr. Alex testified that the cost of moving the old tower to a new location with new pedestals would cost approximately Sixteen Thousand Dollars ($16,000). We believe this is a fair and reasonable figure and one which is supported, although somewhat tenuously, by the evidence. We cannot conclude that the Sixteen Thousand Dollars ($16,000) figure does or does not include overhead but the figure does include cost of materials, cost of moving the tower from the original site to a new site, and labor and cost of a new survey. Also, plaintiff is entitled to trip and lodging expenses which we conclude would have equaled three trips to the Valley Forge area.

Therefore we will award plaintiff the above enumerated damages plus six (6) percent simple interest and costs.

Any statements of fact or law found in this Court's discussions regarding liability or damages which have not been specifically enumerated in the sections entitled "Findings of Fact" and "Conclusions of Law" respectively, are hereby designated "Supplemental Findings of Fact and Conclusions of Law."

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the subject matter of this action and has *in personam* jurisdiction over the defendant corporation.

2. Defendant breached its oral contract with plaintiff pursuant to which defendant was to provide plaintiff with a land survey sufficient to permit plaintiff to erect a directional radio antenna according to a specific azimuth from a specific location in Wallups Island, Virginia.

3. Defendant is liable to plaintiff for all of the expenses incurred by plaintiff which were reasonably foreseeable as a probable result of a breach of said contract at the time the contract was entered into.

4. Defendant is liable to plaintiff for those expenses which would have been incurred by plaintiff had plaintiff moved the tower to a new location because these expenses could have been reasonably foreseen as the probable consequences of a breach of the contract between plaintiff and defendant at the time the contract was entered into.

5. Plaintiff, Edward J. Alex, testified that the cost of moving the old tower to a new location would have been approximately Sixteen Thousand Dollars ($16,000) and there is no evidence to refute his statement. We believe that such a figure is fair and reasonable based on the record as a whole.

6. Plaintiff is also entitled to be reimbursed for the special trips made in connection with moving the old tower to a new location. We conclude that plaintiff would have made the same number of trips in connection with the movement of the old tower that he made to direct the movement of the new tower.

7. Plaintiff's three trips to the site totaling One Thousand One Hundred Twenty-five Dollars and thirty cents ($1,125.30) is a fair and reasonable figure.

8. Plaintiff is normally not entitled to recover attorney's fees in an action for breach of contract. There is no statutory provision providing for the award of attorney's fees in the type of action involved herein.